UNITED STATES BANKRUPTCY COURT
DISTRICT OF MAINE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| In re: | * | |
| | * | |
| PATRICIA JEAN MERRILL, | * | **Chapter 7** |
| | * | **Case No. 05-22818** |
| Debtor | * | |
| \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* | | |
| PATRICIA JEAN MERRILL | * | |
| | * | |
| and | * | |
| | * | |
| WILLIAM HOWISON, Trustee | * | |
| | * | |
| Plaintiffs | * | |
| | * | |
| v. | * | **Adv. Proc. No. 06-2014** |
| | * | |
| MBNA AMERICA BANK, N.A., | * | |
| | * | |
| and | * | |
| | * | |
| WOLPOFF & ABRAMSON, LLP, | * | |
| | * | |
| Defendants | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## MEMORANDUM OF DECISION

Before me is the defendants' motion seeking an order compelling arbitration of all issues raised in the plaintiffs' six-count complaint. The plaintiffs, in turn, ask that all counts be tried in this court. I conclude that only as to the count seeking damages for the defendants' alleged breach of the automatic stay (Count I) have the plaintiffs met their burden to show that the relief they seek inherently conflicts with the Federal Arbitration Act. Thus, the defendants' motion will be granted in substantial part and denied only as to the stay violation count.

**Background**[1]

In July 2000 Merrill completed and signed an application seeking a Mastercard credit card from MBNA. MBNA approved the application and entered into a Credit Card Agreement with her.[2] Merrill requested that the account include "Kenneth Cooley" as an additional authorized user. MBNA assigned to Merrill a credit card with a number ending in 7067. In December 2000 MBNA changed the number to one ending in 9419.[3]

Throughout 2001 Merrill consistently maintained a balance, hovering around $5,000, on the 9419 credit card. In November 2001 Merrill transferred the balance ($4,691.12) to a credit card from a different card issuer. Following the transfer the amount due on the MBNA account stood at $15.65. Merrill paid off the account but did not close it. Her January 2002 MBNA statement shows a $0 balance.

The balance owed on the 9419 card remained at $0 until late September 2002. Merrill's October 2002 MBNA statement shows a $16,500 balance transfer *to* the 9419 account. In an affidavit signed on April 19, 2006, Merrill claims that the $16,500 balance transfer was unauthorized and that she immediately contacted MBNA to dispute it. The affidavit then states

---

[1] Both plaintiffs and defendants have submitted facts supported by affidavit. At the close of argument on defendants' motion, I asked counsel whether they agreed that the record, including affidavits, was complete. Both counsel responded in the affirmative. In any event, although there is some disagreement about the *meaning* of a couple of particular facts, there does not appear to be any true factual dispute.

[2] Merrill's "Preapproved Personal Request Form" included, under her signature, the following term: "MY SIGNATURE MEANS THAT I AGREE TO THE CONDITIONS ON THE REVERSE SIDE OF THIS FORM AND TO BE BOUND BY EACH OF THE TERMS OF THE CREDIT CARD AGREEMENT, INCLUDING ARBITRATION."

[3] The change is unexplained, although during oral argument Merrill's counsel opined that it was done when the "teaser interest rate" period expired.

that in October 2003 Merrill noticed another disputed charge on the 9419 account and requested that MBNA close the account. She says MBNA agreed, but that it then established another account, ending in 6369, "without [her] written or verbal authorization or knowledge."

In an affidavit signed on April 27, 2006, Merrill elaborates on the facts alleged in the April 19 affidavit. She adds that after the September 2002 balance transfer, in addition to calling MBNA several times to dispute the debt, she also wrote several letters to the same end. More specifically, Merrill alleges that on February 7, 2003, she called MBNA's "fraud department" and "explained that Kenneth Vieira was responsible for the charges. At that time, I asked that MBNA put the account in Kenneth Vieira's name. MBNA refused because Mr. Vieira's credit rating was allegedly insufficient."[4] Merrill admits that she made payments to MBNA between December 2002 and November 2004, but states that she only did so to avoid negative credit consequences. She also asserts that most of those payments were made by Kenneth Vieira.[5]

MBNA concedes that it twice changed the account numbers assigned to Merrill. In its affidavit dated April 25, 2006, it avers that changing a customer's account number is an "internal operating procedure utilized by MBNA that had no effect on Merrill's right to use her credit card under the original terms and conditions. . . . The change of account numbers to xxxx-xxxx-xxxx-6369 does not represent a new credit account but is a continuation of the same credit account relationship governed by the same account agreement." MBNA states that Merrill's account was

---

[4] Is "Kenneth Vieira" the same person as "Kenneth Cooley?" The record sheds no light. However, as becomes plain below, we have no need of considering the issue.

[5] Merrill has attached to her April 27 affidavit a photocopy of a check, apparently written in 2003, drawn on the account of a business in Rhode Island and signed with a signature resembling "Kenneth Vieira," payable to MBNA in the amount of $150. The question of who paid or accepted responsibility for the account at that juncture is, for today, beside the point.

closed to further purchases in July 2003 at Merrill's request. The account number was changed in August or September 2003 to prevent fraud after Merrill disputed a charge.

Merrill filed her Chapter 7 petition on October 15, 2005.[6] William Howison was appointed trustee, and following the conclusion of the § 341 meeting, he filed a Notification of Asset Recovery (presumably anticipating proceeds to be realized from this action). Merrill received her discharge on February 13, 2006.

On January 26, 2006, Merrill and Howison filed their complaint against the defendants, MBNA America Bank, N.A. and Wolpoff & Abramson, LLP, a law firm retained by MBNA to collect Merrill's account. The plaintiffs subsequently filed an amended complaint, see Fed. R. Bankr. P. 7015, setting forth six counts, alleging violations of the automatic stay (Count I), the Maine Fair Debt Collection Practices Act (Count II), the Federal Fair Debt Collection Practices Act (Count III), and the Maine Unfair Trade Practices Act (Count IV). Counts V and VI seek damages for intentional or negligent infliction of emotional distress. In response, the defendants filed their motion to compel arbitration.

**Discussion**

The motion to compel arbitration is straightforward. It seeks an order staying this action and compelling the parties to arbitrate their dispute pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 et. seq., and their contractual agreement to arbitrate all disputes that arise from the credit agreement between them. Plaintiffs resist on two grounds. First, they contend that there is

---

[6] Unless otherwise indicated, all statutory sections cited are those of the Bankruptcy Reform Act of 1976, as amended ("Bankruptcy Code" or "Code") 11 U.S.C. § 101 et seq, up to, but not including, the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (Pub. L. 109-8).

no agreement to arbitrate between Merrill and MBNA, and second, that even if there is an agreement to arbitrate, Congress intended claims such as theirs to be tried in the bankruptcy courts.

**1. What, Exactly, *Did* They Agree To?**

Merrill does not dispute that she signed MBNA's credit application and its credit card agreement ("Agreement") or that the documents attached to MBNA's affidavit are accurate copies of them. Rather, she contends, first, that even though she signed the Agreement, her "conduct" shows that she didn't agree to arbitrate disputes anent the unauthorized use of her credit account in the autumn of 2002. She had paid the account in full by January 2002 and carried no balance on it until September 2002, when the allegedly unauthorized $16,500 balance transfer appeared. When she discovered the transfer she immediately disputed it. She also argues that the arbitration clause applies only to her original "account," the one assigned a number ending in 7067, opened in 2000,.

To begin, the general character of the plaintiffs' claims is no bar to arbitration. The Supreme Court has long recognized that "federal statutory claims can be appropriately resolved through arbitration, and [has] enforced agreements to arbitrate that involve such claims." Green Tree Fin. Corp.-Alabama v. Randolph, 531 U.S. 79, 89, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000) (citing Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989) (Securities Act of 1933); Shearson/Am. Express, Inc. v. McMahon, 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987) (Securities Exchange Act of 1934 and Racketeer Influenced and Corrupt Organizations Act); Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985) (Sherman Act)).

5

The first inquiry in determining whether statutory claims may be arbitrated is "whether the parties agreed to submit their claims to arbitration." Randolph, 531 U.S. at 90; Cavanaugh v. Conseco Fin. Servicing Corp. (In re Cavanaugh), 271 B.R. 414, 422 (Bankr. D. Mass. 2001). Resisting arbitration, the plaintiffs bear the burden of showing that Merrill did not agree to it. McMahon, 482 U.S. at 227; MBNA America Bank, N.A. v. Hill, 436 F.3d 104, 108 (2nd Cir. 2005) (citing McMahon, supra); Cavanaugh, 271 B.R. at 421. She must demonstrate that the Agreement's arbitration clause does not apply either to her or to this particular dispute.

The Agreement contains the following relevant terms:

> Your Contract With Us
> Your Credit Card Agreement with us consists of these Additional Terms and Conditions and the document called the Required Federal Disclosures or the Initial Disclosure. You agree to the terms and conditions of this Agreement.
> . . .
> "Card" means all the credit cards we issue to you and to any other person with authorization to use this account pursuant to this Agreement.
> . . .
> You may close your account by notifying us in writing or by telephone and destroying all cards, access checks, and other credit devices on the account. Your obligations under this Agreement continue even after you have done this.
> . . .
> We may amend this Agreement at any time. We may amend it by adding, deleting, or changing provisions of this Agreement. . . . The amended Agreement (including any higher-rate or other higher charges or fees) will apply to the total outstanding balance, including the balance existing before the amendment became effective. We may replace your card with another card at any time.
> . . .
> Any claim or dispute ("Claim") by either you or us against the other, or against the employees, agents, or assigns of the other, arising from or relating in any way to this Agreement or any prior Agreement or your account (whether under a statute, in contract, tort, or otherwise and whether for money damages, penalties, or

6

>           declaratory or equitable relief), including Claims regarding the
>           applicability of this Arbitration and Litigation section or the
>           validity of the entire Agreement or any prior Agreement, shall be
>           resolved by binding arbitration. . . .  This Arbitration and
>           Litigation section shall survive the termination of your account
>           with us as well as any voluntary payment of the debt in full by you,
>           any bankruptcy by you, or the sale of the debt by us.

Affidavit of Gregory B. Canarp, Exhibit A, Motion to Compel Arbitration [dckt. #9].

      The Agreement does not distinguish between classes of arbitrable verses non-arbitrable claims.  Merrill's denial of any liability for the 2002 balance transfer has no relevance to the question of arbitrability.  The Agreement's arbitration clause declares that "[a]ny claim or dispute . . . arising from or relating in any way to this Agreement . . . shall be resolved by binding arbitration."  Merrill's defenses: "I'm not responsible for the debt," and "you violated statutes in dealing with your credit card claims against me," do not alter the dispute's genesis.  It is sourced in the Agreement.  It arises from Merrill's credit relationship with MBNA.  Put simply, Merrill agreed to arbitrate all claims arising from the Agreement, including those involving unauthorized use of the account and MBNA's account collection conduct.

      Merrill also contends that she did not agree to arbitrate claims arising from any "account" other than the "one" for which she signed an application in July 2000 (i.e., the account ending in 7067).  This contention rests, however, on her mistakenly conflating the notion of her "account" with the credit card number assigned it.  She in fact has, and only has had, one account with MBNA, even though the account has been assigned three different card numbers.  Such redesignation is specifically permitted under the Agreement: "We may replace your card with

another card at any time."[7]

Merrill has failed to carry her burden to show that she and MBNA did not agree to arbitrate the disputes now pending between them. That is not the end of this story, however, as the plaintiffs have another arrow in their quiver.

**2. Arbitration Agreement Notwithstanding, Should The Plaintiffs' Claims Be Determined in The Bankruptcy Court?**

One count of the complaint alleges violations of the automatic stay, three allege violations of state and federal consumer protection statutes, and two sound in tort. The parties agree that the stay violation count is core, see 28 U.S.C. § 157(b); Fortune & Faal v. Zumbrun (In re Zumbrun), 88 B.R. 250, 253 (B.A.P. 9th Cir. 1988); In re Pawlowicz, 337 B.R. 640, 645 (Bankr. N.D. Ohio 2005), and that the remaining counts are non-core. That is about all they agree on.

In order to prevail in their efforts to resist arbitration in the face of an applicable arbitration clause, the plaintiffs must show that the dictates of the Federal Arbitration Act ("FAA"), requiring arbitration of disputes parties have agreed to arbitrate,[8] must give way to the

---

[7] The credit card Merrill had during almost all relevant times was the one ending in 9419. She maintained a substantial balance on that card, paid it off, disputed a transfer to it, and made further payments on it. Her card number wasn't changed the second time until she reported a fraudulent charge in late 2003. MBNA removed that charge then changed the number to protect Merrill against further unauthorized use.

[8] The relevant provision of the FAA states:

If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of

manifest objectives of another statute, here the Bankruptcy Code.

To do so, they must "show that Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue," McMahon, 482 U.S. at 227, *i.e.,* the bankruptcy rights. "Congressional intent can be deduced from the statute's text or legislative history, or from 'an inherent conflict between arbitration and the statute's underlying purposes.'" Hill, 436 F.3d at 108 (quoting McMahon, 482 U.S. at 227). In making my determination whether this "inherent conflict" exists, I remain mindful of the "'liberal federal policy favoring arbitration agreements.'" Randolph, 531 U.S. at 91 (citing Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983)).

The plaintiffs' argument that there is an inherent conflict between their claims and the FAA rests on characterizing their allegations that MBNA violated the automatic stay as the "heart" of their complaint. They portray all of the other counts in the complaint as "derivative" of that claim. Because the stay violation count is within this court's core jurisdiction, and because the stay is a central feature of the Bankruptcy Code, the plaintiffs argue that its determination must remain in the bankruptcy court. Alternatively, plaintiffs contend that if I don't agree that all of their claims "derive" from the stay violation count, I should nonetheless exercise my discretion to retain the entire action, so as to avoid piecemeal litigation.

A. The "Core" of Plaintiffs' Complaint.

Given that Count I, seeking damages for MBNA's alleged violations of the automatic

---

the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3.

stay, § 362(a) and (h), is a core matter, I have jurisdiction to enter final judgment on it. 28 U.S.C. § 157(b). But, the plaintiffs' arguments notwithstanding, that feature is not alone sufficient to demonstrate an "inherent conflict" between the Bankruptcy Code and the FAA.[9] In Insurance Co. of N. Am. v. NGC Settlement Trust & Asbestos Claims Mgmt. Corp. (In re Nat'l Gypsum Co.), 118 F.3d 1056 (5th Cir. 1997), the successor to a Chapter 11 debtor brought a declaratory judgment action in the bankruptcy court, seeking a declaration that amounts allegedly owed the defendant by the debtor were discharged upon confirmation of the debtor's Chapter 11 plan, and that defendant's actions seeking to collect the debt from the successor trust violated the discharge injunction of § 524(a). Nat'l Gypsum, 118 F.3d at 1058-60. After determining that the plaintiff's declaratory judgment action was a core proceeding, id. at 1063-64, the Fifth Circuit responded to the argument that "arbitration of core bankruptcy proceedings [is] inherently irreconcilable with the Bankruptcy Code," id. at 1067:

> Rather, as did the Third Circuit in Hays, we believe that nonenforcement of an otherwise applicable arbitration provision turns on the underlying nature of the proceeding, *i.e.,* whether the proceeding derives exclusively from the provisions of the Bankruptcy Code and, if so, whether arbitration of the proceeding would conflict with the purposes of the Code. In this regard, we agree with [the defendant] that the discretion enjoyed by a bankruptcy court to refuse enforcement of an otherwise applicable arbitration provision depends upon a finding that the standard set forth in McMahon has been met. . . . The core/non-core distinction conflates the inquiry set forth in McMahon and Rodriguez with the mere identification of the jurisdictional basis of a particular bankruptcy proceeding. Certainly not all core bankruptcy proceedings are premised on provisions of the Code that 'inherently conflict' with the Federal Arbitration Act; nor would

---

[9] Although not entirely clear, the plaintiffs appear to argue that designation of a claim as "core" necessarily leads to the conclusion that an "inherent conflict" exists between its adjudication and the FAA.

>arbitration of such proceedings necessarily jeopardize the
>objectives of the Bankruptcy Code. Although, as appellees
>suggest, 'the core/non-core distinction is a practical and workable
>one,' it is nonetheless too broad.

Id; see also Hill, 436 F.3d at 108 ("[E]ven as to core proceedings, the bankruptcy court will not have discretion to override an arbitration agreement unless it finds that the proceedings are based on provisions of the Bankruptcy Code that 'inherently conflict' with the Arbitration Act or that arbitration of the claim would 'necessarily jeopardize' the objectives of the Bankruptcy Code."); Cavanaugh, 271 B.R. at 424-25 (agreeing that core/non-core distinction, alone, is insufficient to determine inherent conflict).

It is thus not enough for the plaintiffs to show only that the claim is core - they must go the next step, as required by McMahon, and show "whether the text or purposes of the Bankruptcy Code would be violated so significantly by enforcing an arbitration clause in the particular factual circumstances of the case before the Court that it can fairly be said that Congress would not have intended those provisions or purposes to be overridden by the Federal Arbitration Act." In re Chorus Data Systems, Inc., 122 B.R. 845, 852 (Bankr. D.N.H. 1990) (granting creditor's motion for relief from stay to continue with arbitration matter in Chapter 11 case, where proof did not support debtor's argument that its reorganization efforts would be harmed by arbitration).

Hill is Exhibit A for creditors who would argue that even basic bankruptcy protections such as the automatic stay are appropriate for arbitration. Hill is the primary authority relied on by MBNA in this case. It is, however, largely distinguishable, and to the extent not, I respectfully disagree with its conclusion.

In Hill, the Second Circuit overturned a bankruptcy court decision denying MBNA's

11

motion to compel arbitration of the debtor's stay violation action, holding that the bankruptcy court "did not have discretion to deny the motion to stay." Hill, 436 F.3d at 110.  The court relied on three factors in reaching its decision: (1) the debtor's estate had been fully administered and resolution of the claim would have no effect on the bankruptcy estate; (2) the debtor's action sought class certification, so it lacked a "direct connection" to the bankruptcy case; and (3) the stay is not so much like a case-specific injunction that a bankruptcy court is "uniquely" able to determine its reach.  Id. at 109.

In Merrill's bankruptcy, the estate has not yet been fully administered.  Rather, it awaits resolution of this action (in which the trustee has joined).  No class certification is sought.  And most importantly, I agree with the Fifth Circuit's Nat'l Gypsum observation that "distinguishing between those actions derived from the debtor and those created by the Bankruptcy Code explains the consistent reluctance to permit arbitration of actions brought to adjudicate *bankruptcy rights*.  There can be little dispute that where a core proceeding involves adjudication of federal bankruptcy rights wholly divorced from inherited contractual claims, the importance of the federal bankruptcy forum provided by the Code is at its zenith." Nat'l Gypsum, 118 F.3d at 1068 (recognizing that bankruptcy court retains "significant discretion" to assess whether arbitration would be consistent with the purposes of the Code where the claim is derived entirely from rights conferred by the Code); cf.  Bezanson v. Consolidated Constructors & Builders (In re P&G Drywall and Accoustical Corp.), 156 B.R. 704 (Bankr. D. Me. 1993) (staying action for arbitration of state law claims, while retaining jurisdiction over stay violation claim).

As recognized by Judge Feeney in Cavanaugh, a case in which she denied a lender's motion to compel arbitration of the debtor's stay violation action, the First Circuit has expressly

and consistently stated its recognition of the automatic stay's central role in bankruptcy matters. Cavanaugh, 271 B.R. at 422; Soares v. Brockton Credit Union (In re Soares), 107 F.3d 969, 975 (1st Cir. 1997) ("automatic stay is among the most basic of debtor protections under bankruptcy law" and "courts must display a certain rigor in reacting to violations"); Mann v. Chase Manhattan Mortgage Corp., 316 F.3d 1, 3-4 (1st Cir. 2003); see also Bright v. Washington Mutual Bank, F.A. (In re Bright), 338 B.R. 530, 535 (B.A.P. 1st Cir. 2006). The automatic stay and entitlement to remedies for its violation are creatures of the Code, as opposed to private, "inherited" rights. They create the foundation of debtor protection to be provided through the offices of the specialized bankruptcy court.

I conclude that ordering arbitration of Merrill's stay violation claim would conflict with this court's duty to safeguard the automatic stay's fundamental protection for debtors. I will exercise my discretion to deny the defendants' motion to compel arbitration of Count I of the complaint.[10]

B. The "Non-Bankruptcy" Counts.

Plaintiffs seek to piggy-back their other claims onto my determination to retain the stay

---

[10] Putting a finer point on it, I understand Hill's reluctance to equate enforcing the statutory stay with a judge interpreting and enforcing the provisions of an injunction he or she penned. But, even so, that does not mean that applying and enforcing the stay (and related provisions) is a simple exercise where a bankruptcy judge's experience and training are not required. The Code's automatic stay is complex, and, with passage of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, it became more complex. See e.g., 11 U.S.C. § 362(b)(19)-(28) (new instances where filing of bankruptcy petition does not act as stay); 11 U.S.C. § 362(c)(3), (4) (instances where stay may arise, then lapse, or may not arise at all unless sought). Moreover, assessing the import of creditor action, often the product of state law processes, in light of the stay's protections can be a challenge. E.g., Jamo v. Katahdin Fed. Credit Union (In re Jamo), 283 F.3d 392, 398-99 (1st Cir. 2002) (recognizing difficulty of determining interplay between Code provisions respecting automatic stay and reaffirmations, especially with regard to creditor's ability to negotiate at arms length with a debtor protected by the stay).

violation count. They contend that to require arbitration of some, but not all, of their claims would result in burdensome piecemeal litigation and that the remaining counts "derive" from the alleged stay violations sufficiently to defeat the motion to compel.

First, with respect to arbitration of some, but not all, counts of the complaint, the Supreme Court has recognized that Congress's primary motivation in passing the FAA was not "to promote the expeditious resolution of claims[,]" but rather to "ensure judicial enforcement of privately made agreements to arbitrate." Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 219, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985). The Court has acknowledged that rigorous enforcement of arbitration agreements might very well lead to piecemeal litigation but has determined that was the result Congress has dictated. Id. at 220-21; see also Hay Group, Inc. v. E.B.S. Acquisition Corp., 360 F.3d 404, 410-11 (3rd Cir. 2004) (rejecting argument that efficiency of litigation is prime purpose behind FAA); Bezanson, 156 B.R. at 706 (noting that retention of stay violation count and arbitration of breach of contract counts would result in piecemeal litigation, but recognizing that arbitration would likely "sufficiently narrow[]" the action to permit swift resolution of the stay violation count following arbitration). The fractured litigation of plaintiffs' action that will result from compelling arbitration of some, but not all, counts of the complaint is not a sufficient justification for retaining the entire matter.

The final argument against arbitration of plaintiffs' non-core claims is that, as they phrase it, all of their claims are "derivative" of the stay violation and, therefore, the entire matter should be decided in this court. The plaintiffs assert that since the same course of conduct is the

14

gravamen of their complaint, the entire controversy should be treated as a piece.[11]

      Nat'l Gypsum recognizes that the central focus of a determination of "inherent conflict," a-la McMahon, "turns on the underlying nature of the proceeding, *i.e.,* whether the proceeding derives exclusively from the provisions of the Bankruptcy Code." Nat'l Gypsum, 118 F.3d at 1067. Where causes of action do not arise directly from the Code, but rather from the debtor's prepetition rights, my "discretion" to deny a motion to compel arbitration is severely limited. Id. at 1069.

      In Mintze v. American Gen. Fin. Services, Inc., 434 F.3d 222 (3rd Cir. 2006), a Chapter 13 debtor filed an adversary proceeding against her mortgage lender, seeking to enforce a prepetition rescission of the mortgage under the Truth In Lending Act, 15 U.S.C. §§ 1601-1667f, and pressing claims for violations of state and federal consumer protection statutes. Mintze, 434 F.3d at 226. The bankruptcy court concluded that the outcome of the debtor's action would affect her Chapter 13 plan and the distribution creditors would receive, and therefore denied the creditor's motion to compel arbitration. Id. at 227. The district court affirmed, holding that the bankruptcy court had acted within its discretion. Id. The Third Circuit accepted the proposition that the debtor's causes of action were core, but citing Nat'l Gypsum, held that "[w]here an otherwise applicable arbitration clause exists, a bankruptcy court lacks the authority and discretion to deny its enforcement, *unless* the party opposing arbitration can establish

---

[11]     Indeed, plaintiffs' complaint asserts that conduct allegedly engaged in by defendants violates bankruptcy law, state law, and non-bankruptcy federal law, and was tortious, to boot. It is true that there is but one course of conduct. To describe it all as "derivative" of the stay violations, however, is to too loosely elevate the alleged bankruptcy violation. In fact, the alleged stay violation(s) could just as likely be characterized as incidental, a result of timing, to the defendants' allegedly improper collection activities.

congressional intent, under the McMahon standard, to preclude waiver of judicial remedies for the statutory rights at issue." Id. at 231. In other words, no discretion even exists until the McMahon evidence of congressional intent-to-preclude test (as shown by "inherent conflict" or statutory text or legislative history) is met.

In reversing the district court, the Third Circuit held that the debtor's causes of action failed to raise any "bankruptcy issue" at all, but instead raised only statutory issues of state and federal consumer protection laws. Id. at 231-32. The statement is arguably a somewhat strained interpretation of "bankruptcy issue" given the context of the ongoing Chapter 13 plan, see e.g., Jacob Aaron Esher, *Arbitration and Judicial Discretion: Circuits Are Split*, Norton Bankr. L. Advisor, May 2006, 6, at 9-10 (criticizing Mintze's finding of no "bankruptcy issue" as "overly simplistic"), but it applies with force here, where there is no reorganization in process. I therefore conclude that in this Chapter 7 case, where the debtor is party to an arbitration agreement and, with the trustee, is pressing state and federal consumer protection rights, I do not have discretion to deny the creditor's motion to compel arbitration of those claims.

## **Conclusion**

For the reasons set forth above, the defendants' motion to compel arbitration will be granted as to Counts II through VI of the amended complaint, and denied with respect to Count I. Proceedings under Count I will be stayed pending conclusion of the parties' arbitration. A separate order consistent with this opinion will enter forthwith.

|  |  |
|---|---|
| June 16, 2006 | /s/ James B. Haines, Jr. |
| Date | James B. Haines, Jr.<br>U.S. Bankruptcy Judge |